# Gerber's Estate.

*Wills—Perpetuities.* ·

Testator left to survive him one child, a son, eight grandchildren, issue of the son, and seven great-grandchildren, being grandchildren of the son. He gave his estate in trust to his executors for the purpose of accumulation until the time of final distribution. During the interval they were to pay certain designated annuities and bequests to grandchildren. He then directed as follows : " Then after the death of all my grandchildren and the youngest grandchild living of my son has become twenty-two years of age ; then all my real estate shall be sold at public sale . . . . and the proceeds along with all the personal property I own shall be converted into money by my executors, to be divided among the lawful heirs of my son, share and share alike according to law, not taking into consideration any bequests and payments I otherwise have made." *Held,* that the rule against perpetuities was violated and that the son took the estate absolutely.

Argued May 14, 1900. Appeal, No. 427, Jan. T., 1899, by H. F. Breneman et al., executors of Andrew Gerber, deceased, from decree of O. C. Lancaster Co., dismissing exceptions to auditor's report in the Estate of Andrew Gerber, deceased. Before GREEN, C. J., McCOLLUM, MITCHELL, DEAN and MESTREZAT, JJ. Affirmed.

Exceptions to report of John M. Groff, Esq., auditor.

The will of testator was as follows :

" First, I order that my debts and funeral expenses to be paid, by my executors as soon as convenient after my decease.

"1st Item. It is my will and I so order that my son, Christian N. Gerber, and his son, Martin E. Gerber, shall have the net income of the farm they now live jointly. Thus my son, C. N. Gerber, is to have the one-half and his son, Martin E. Gerber, the other net half of the income, as per our agreement I hold in writing. After the death of my son, C. N. Gerber, then my grandson, Martin, shall have all the net income of said farm for his family use and living during his life time. Then after the death of all my grandchildren and the youngest grandchild living of my son, C. N. Gerber, has become 22 years of age, then all my real estate shall be sold at public sale, after three months' public notice given in one Mt. Joy and one Lancaster

newspaper, that I have not otherwise disposed of, by my hereinafter named executors or their successors, as herein provided, and the proceeds, along with all my personal property I own, shall be converted into money by my executors to be divided among the lawful heirs of my son, C. N. Gerber, share and share alike, according to law, not taking into consideration any bequest and payments I have otherwise made.

" It is my wish and I so order that my grandson Martin shall stay on the farm where he now lives, to raise his children so that they will learn to work, if it can be so arranged by my executors, because they shall be his overseers. See that he has an honest, good man to manage the farm along with him, or rent the farm on the shares that they think best for his family, and to keep the farm in good repair and condition, until it shall be sold as I order. After the death of my grandson, Martin, his family shall have no more possession right on said premises by my will but they shall be at the mercy of my executors until final distribution is made by them as I have ordered. Not any lawyer nor Auditor need be employed to distribute my effects.

" I leave my whole estate in the hands of my executors, hereinafter named, and their successors chosen as herein provided, and I order that they shall as best as can for my estate, either at public or private sale as they can agree, sell all my real estate and give title to the purchaser as above ordered, and after realizing from all of my personal property, as ordered, then they shall appoint a day and place to meet to make the final distribution. First publish in one Lancaster and one Mt. Joy paper not less than 90 days. Then make the distribution as herein directed, and have all the heirs to sign the same one release and have it recorded, and place it in my bank book and deposit all in the vault of the bank where my accounts are kept, in the First National Bank of Mt. Joy, and should the bank be closed or get in poor credit, then I order that my account shall be kept in the nearest National Bank of good standing.

" 2d Item. I give and bequeath unto my granddaughter Martha, married to Michael M. Souder, the Heistand farm in Rapho Twp., whereon they now live, containing 104 acres. To hold the same in full possession and to have the income jointly with her husband as long as she lives. Five years after her decease, the said farm shall be sold at public safe by my execu-

tors, as if she leaves no issue. If she should leave one or more children, then the said farm shall not be closed until my estate is closed up as I have ordered in item one (1).

" If the said farm is sold, my executors shall loan the money as best as they can on first mortgage or judgment until final distribution.

" This bequest is made to conform with a lease I made with said Souders, dated Aug. 1, 1896, of which a copy is in the hands of my executors.

" 3d Item. I give and bequeath unto my granddaughter, Sarah, married to Abner N. Hershey, the small farm of 31 acres, more or less, in Mt Joy Twp., known as the Kocher property, whereon they now reside ; and also my 6 acre pasture land in Rapho Twp., on the back run, adjoining lands of David L. Miller and others. All those two tracts are to be for the use and their family as long as they live. After the death of my granddaughter, Sarah and her husband, then these properties shall be sold by my executors as I have ordered in item one (1).

" This bequest is made to conform with a lease I made to said Hershey, dated Aug. 1, 1896, of which a copy is in the hands of my executors, shall care for them until they are 22 years of age.

" 4 Item. I give and bequeath to my granddaughter, Katie Gerber, married to Samuel K. Landis, the Geyer farm and mill on it, being 100 acres, where they now live in Rapho Twp., Lancaster County, Pa., to hold the same in full possession as long as they live, and to have the income jointly with her husband for their support and living.

" This bequest is made subject to a lease I made with Samuel K. Landis, Aug. 1, 1896. After their decease, the property is to be disposed of as I have ordered in item one (1). Should they both die and leave their children orphan, then my executors shall care for them until they are 22 years of age.

" 5 Item. I give and bequeath unto my grandson, Benjamin F. Gerber, the Erb farm of 100 acres in East Donegal Twp., whereon he now resides, to have and to hold the same for his benefit, and the income to be for his use as long as he lives, and after his decease the farm is to be disposed of as I have ordered in item one (1) and item sixteen (16).

" This bequest is also made subject to a lease I made with him, August 1, 1896. Should he leave any offspring, then the farm

is to be rented by my executors, and the net proceeds to be divided among them yearly until the final distribution is to be made when the youngest grandchild living of my son, C. N. Gerber, is 22 years of age, but not until my grandchildren are all dead.

" 6 Item. I give and bequeath unto my granddaughter, Barbara Gerber, married to Clinton H. Eby, the Joseph Nissley farm near Michael Moor's Mill, being 111 acres, to have and to use the income jointly with her husband as long as she lives. Should she die, five years after her decease the said farm shall be sold by my executors as I have ordered in item one (1), if she leaves no issue. If she leaves one or more children, then the said farm shall not be sold until my whole estate is closed up as I have ordered in item one (1).

" This bequest is made to conform with a lease I made with said Clinton H. Eby, of which a copy is in the hands of my executors, dated Sept. 1, 1897.

"Should they both die and leave their children orphans, then my executors shall care for them until they are 22 years of age.

" 7 Item. I give and bequeath unto my grandson, Christian S. Gerber, the Geyer farm of 100 acres, more or less, in Mount Joy township, now farmed by Amos Bricker, to hold the same in full possession as soon as he is 22 years of age, to have the use and income of it as long as he lives, subject to a lease he is to sign for my executors when he is 22 years of age before he shall come into possession of said farm. After his decease the said farm shall be disposed of by my executors as I have provided in item one (1). If he leaves one or more issue, then the farm shall not be sold, but it shall be rented by my executors for the benefit of his children until final settlement, if they all should die, then the farm shall be sold at once and the money put on·interest for my estate.

" 8 Item. It is my will and I so order that the chestnut timber land I own in Rapho Twp., being 15 acres, near the back run adjoining the Landis farm and others, this shall be for the joint use of all my grandchildren to take rails, posts and fire-wood for their family use as long as they live, subject to the orders and supervision of my executors hereinafter named.

" See the tenant's lease on file in my desk.

" 9 Item. The four acres sprout land on the chestnut hill shall be for the use of any of my grandchildren and my tenant to take fire-wood, etc., as they need it, subject to orders and consent of my executors hereinafter named.

" See the tenant's lease on file in my desk.

" 10 Item. Should any of my grandchildren die and have offspring, and if they also die and leave no lawful offspring, then the farm I have given to my grandchild shall be sold at once by my executors and proceeds loaned out for my estate on real estate security until final distribution is made as provided in item one (1).

"After the expiration of five years after the death of any of my grandchildren that leave no offspring, then the farm I have given to possess during life shall be sold and the proceeds loaned out on real estate security, from time to time for the benefit of my estate until final distribution is made as ordered in item one (1).

" 11 Item. I order that my executors shall pay semi-annually the boarding and washing of my grandson, Samuel (being subject to epileptic fits), to any of his sisters that he chooses to live with, from time to time during his life time. Said Samuel shall be at liberty to choose his home to be with either one of his sisters, then my executors shall not pay for his boarding keeping of him to anyone else.

" Should my grandson, Samuel, become worse and get troublesome that neither of his sisters will want him, then my executors shall choose a proper place and put him there to be properly cared for and the expenses to be paid out of my income.

" 12 Item. It is my wish and I so order that my executors shall accept written orders from each Sabbath-school treasurer in the Borough of Mount Joy on either of the Mount Joy or Florin coal dealers for coal, delivered each year in October, to an amount not over $6.00 from each Sabbath-school as now kept up in the different churches in Mount Joy Borough, until final distribution is made of my whole estate as ordered in item one (1).

" 13 Item. It is my will and I so order that my executors shall yearly pay out of my income, on April 1, to my heirs as follows : $100.00 to my granddaughter, Sarah, married to Abner

M. Hershey; $100.00 to my granddaughter, Katie A. Landis, and $50.00 to my grandson, Samuel S. Gerber.

"They shall also pay yearly $50.00 to the Deacon of the Kraybill Old Mennonite Meeting House in East Donegal Twp. ; $50.00 to the Deacon of the Reeser's Old Mennonite House in Mount Joy Twp. ; $50.00 to the Deacon of the Chestnut Hill Old Mennonite Meeting House in West Hempfield Twp., near Michael Musser at the Lancaster and Marietta Turnpike, and $50.00 to the Deacon of the Bassler Old Mennonite Meeting House in West Donegal Twp., and their successors, payments to be made on January 1 of each year.

"This bequest shall only be used to assist the most needy preachers and faithful needy church members belonging to the Old Mennonite Church, living in the district of each respective church or meeting house mentioned, that are in need of help, living a Christian life and for no other purpose. It shall not be used for missionary or building purposes, but to pay for fuel, clothing, etc.

"I further order that my executors shall pay to the treasurer of the Mount Joy Cemetery board, $5.00 every year on July 1, to be used for to keep the lot of Peter Helman, the lot of Abraham Reinhart, the lot of Levi Gallacher adjoining my lot, the lot of Christian Grube, and my lot, whereon my wife is buried and where I am to be buried on the east side of our monument, to keep clean of weeds and briars according to the rules and regulations of the cemetery board from time to time.

"My executors shall also pay to the following named Sabbath-schools, viz : $50.00 to the treasurer of the Kraybill Mennonite Sabbath-school, in East Donegal Twp. ; $50.00 to the treasurer of Bassler's Mennonite Sabbath-school, in West Donegal Twp. ; $50.00 to the Reeser Old Mennonite Meeting House Sabbath-school treasurer, in Mount Joy Twp. ; $50.00 to the Chestnut Hill Old Mennonite Meeting House Sabbath-School, situate near Michael Musser, close to the Lancaster and Marietta turn-pike, in West Hempfield Twp.

"Those payments are to be made yearly, when the Sabbath-schools are started up.

"Should no Sabbath-school be started, then the $50.00 should be paid to the deacon of that church to be used for the poor

and needy members of that church, yearly, until the Sabbath-school is again started up.

"14 Item. This is to show that I have now in the safe vault, in drawer No. 35, in the Farmers National Bank of Lancaster, Twenty-Six Thousand Dollars ($26,000.00), Reading & Columbia Railroad first Mortgage 5 per cent. bonds, interest due March and September; and $4,000.00 Reading City Traction Company 6 per cent. bonds, interest January and July and $5,000.00 Wilkesbarre and Wyoming Traction Company 5 per cent. bonds, interest April and October and a $1,000.00 6 per cent. bonds of the City of Middleborough in Bell County, Kentucky, interest, April and October, on this they pay only 4 per cent. interest now.

"I also have in a drawer in the safe of the First National Bank of Mount Joy, I have the keys in the upper drawer of my writing desk at the right hand end, $20,000.00 Cornwall & Lebanon Rail Road at 5 per cent. Registered Bonds, and, also, a $3,250.00 bond for Martin L. Greider, 5 per cent. interest, and the State taxes duly recorded, and a $5,000.00 judgment bond from W. L. Heisey and his father at 5 per cent. interest, duly recorded and, also, I have 100 shares of the Lehigh Valley Rail Road stock, par value is $50.00, and 100 shares of the Lancaster City Gas, Light & Fuel Co. stock, par $25.00; this cost me $3,500.00. I also have 20 shares of the Columbia National Bank, par value $100.00 dividend semi-annually, 2 per cent.

"I also have 51 shares of the Columbia and Chestnut Hill turnpike stock, par value $20.00 dividend in October.

"I also have 3 shares of the First National Bank of Mount Joy, par value $100.00, dividend January and July; also a judgment bond from John Stauffer & Benjamin S. Stauffer $7,000.00, 5 per cent. interest, duly recorded, and a mortgage from Christ. Seitz, $6,000.00, interest 5 per cent., duly recorded; also a judgment from John D. Hossler, interest 5 per cent., duly recorded, $2,500.00.

"15 Item. It is my will and I so order that my executors shall pay yearly out of my income until my estate is closed up, all the county, school and State taxes lawfully assessed, and also the fire insurance tax on all the real estate and taxable personal property I own until final distribution is made as I

have ordered in item one (1) of this my last will and testament.

"I further order that my executors shall pay $50.00 out of my income to each one of my great-great-grandchildren on the day when they arrive to be 22 years of age, and every year thereafter until the youngest and the last one is 22 years of age, and my estate is to be settled up as I have ordered in item one (1). And, when the third great-grandchild has arrived at the age of 22 years and there are no more than 18 great-grandchildren in sight, then they shall be paid $75.00 in place of $50.00, and when the sixth great-grandchild is 22 years of age, then they shall be paid $100.00 yearly, if there are no more than 20 in sight.

"16 Item. I order that my executors shall keep the account of my estate in the First National Bank of Mount Joy in my name as I have it, and one of my executors shall do the signing, as is required by the bank, as all payment out of my estate shall be made by checks."

"All the proceeds of my income, properties sold, interest collected from money, stocks, bonds, rentals and whatsoever realized out of my properties from time to time, converted into cash, shall be deposited to my credit in said bank as it comes into the hands of my executors.

"I order that my executors shall loan out as best as they can for my estate on real estate securities, the money that is left over yearly by April 1st after all the yearly payments have been made I have ordered.

"I further order that if anyone of my executors, hereinafter named, should die or become unfit or refuse to act his part in good faith, then his pay shall be stopped at once and the other two shall choose another one in his place from among the church members of either of the four churches mentioned that the $50.00 payments are to be made yearly; they shall choose a young man, not under 25 years of age, of good standing, with sound sense and being a faithful housekeeper of his own affairs, and an honest church member of the mentioned Old Mennonite Church.

"If my executors shall not agree on a proper man as ordered in 30 days after the vacancy has occurred, then I order that the deacons of the four churches mentioned to receive yearly pay-

ments shall jointly name a man in good standing in their church, as mentioned, to fill the vacancy that may happen from time to time among my hereinafter named executors and their successors.

"And for all the work and trouble that my executors hereinafter named or their successors will necessarily have to do in looking after and managing my estate for the benefit of my bequests, my grandchildren and the legal heirs coming after them of my son, Christian N. Gerber, and the final settling up and distributing my effects as I have ordered in this my last will and testament. Thus I order that each one of my executors shall draw out of my account $50.00 for the payments of their services yearly, which shall be in lieu of the percentage, otherwise allowed by law to executors settling up such estate.

"I hereby constitute and appoint Dr. Henry F. Breneman, Abraham L. Nissely and Michael M. Souder, married to my granddaughter, Martha, to be my executors of this my last will and testament, signed and sealed the first (1st) day of August, A. D. 1896."

The auditor reported as follows :

The said testator died testate on June 23, 1898, leaving one child, Christian N. Gerber, who has appointed the Lancaster Trust Company his trustee, as above stated.

Testator left eight grandchildren, all children of his only child, Christain N. Gerber, who are named in the minutes attached hereto.

Testator left seven great-grandchildren, being grandchildren of his son, Christian N. Gerber, all of whom are named in the minutes attached hereto.

A copy of the will of decedent is attached hereto.

From an examination of the annexed copy of the will it is apparent that in it the testator attempts to create two separate and distinct interests or estates out of the money in the hands of the accountants, to wit:

1. An estate or interest in trust (his executors as trustees) for the purpose of accumulation until the time it is to be paid to those who are to receive it in final distribution, and during a part of this time to pay the annuities of $250 to three of his grandchildren, the board and washing of another, and during the whole of this time to pay $400 to four churches, $30.00 to

or for five Sunday schools, and $5.00 to a cemetery and taxes and insurance on testator's property.

He further directs that annuities are to be paid to great-grandchildren on their arrival at a certain age.

2. Upon the determination of the first estate, an absolute estate to the heirs of his son, C. N. Gerber, in the following words : " Then after the death of all my grandchildren and the youngest grandchild living of my son, C. N. Gerber, has become twenty-two years of age ; then all my real estate shall be sold at public sale . . . . and the proceeds along with all the personal property I own shall be converted into money by my executors, to be divided among the lawful heirs of my son, C. N. Gerber, share and share alike according to law, not taking into consideration any bequests and payments I otherwise have made."

Your auditor will first deal with the second estate. First, is it a vested estate or will the time when it will vest occur beyond the period allowed by the rule against perpetuities, viz : life or lives in being at the death of testator and twenty-one years thereafter, and is it therefore void ?

In order to determine these two questions it will be necessary to find from the will just what the testator intended, and then apply the rule.

Prof. Gray, in section 629 of Work on the Rule against Perpetuities, says : " The rule against perpetuities is not a rule of construction, but a peremptory command of law. It is not like a rule of construction, a test more or less artificial to determine intention. Its object is to defeat intention. Therefore every provision in a will or settlement is to be construed as if the rule did not exist, and then to the provisions so construed the rule is to be remorselessly applied."

It is only necessary to ascertain the time when the testator intended the heirs of C. N. Gerber to get his estate for the purpose of applying the rule.

1. It must occur after the death of C. N. Gerber, testator's son, for until then the heirs of C. N. Gerber could not be ascertained.

2. It must occur after the death of all C. N. Gerber's children, testator's grandchildren, which would include those living at the time of testator's death as well as those born afterwards.

Those born after testator's death and their children are objects of testator's bounty. They would all be heirs of C. N. Gerber. It has been held, in Minnig v. Batdorff, 5 Pa. 503, that if there is "a gift over to the children of the person taking the interest, or any other person, the limitation will embrace not only the objects living at the death of the testator, but all who shall subsequently come into existence before the period of distribution." The reasoning in that case will apply with equal force where the time for distribution is fixed by the death of all of a class.

3. It must occur after or at the time when "the youngest grandchild living of my son, C. N. Gerber, has become twenty-two years of age." Much depends on what testator intended by the word "living." Did he mean living at the time of his death or at the time of his distribution? That he meant living at the time of his distribution is shown.

1. All C. N. Gerber's children might die before his death. The youngest great-grandchild living at the time of testator's death might attain the age of twenty-two years before C. N. Gerber's death. The time for distribution might thus arrive with no one to take, as the heirs of C. N. Gerber cannot be ascertained until his ·death. But if testator meant after the death of all children of C. N. Gerber, those living at the time of his death as well as those born after, and the arrival of the youngest great-grandchild living, after the death of all grandchildren, the time for distribution could arrive and those who were to take could be ascertained.

2. The whole shows his intention to provide for all children of his grandchildren, even though they have none at the time of testator's death.

He provides for the children of Martha Souder (item 2), Benjamin F. Gerber (item 5), Barbara Eby (item 6), Christian S. Gerber, (item 7) ; yet none of these had children at the time of the testator's death. If the testator meant living at his death, none of these provisions could be carried out, if these children should die about the same time, after the death of the other grandchildren, and after the great-grandchildren living at the death of testator had attained the age of twenty-two years.

3. Testator had only seven great-grandchildren at the time

of his death, yet he provided for the payment of annuities to them when three have attained the age of twenty-two years, and there are no more than eighteen in sight; and these annuities are to be increased when six attain the age of twenty-two years and there are no more than twenty in sight.

4. The children of Barbara Eby are provided for until they are twenty-two years of age (item 6) yet she had none at the time of testator's death. This might be impossible if it meant living at death of testator.

5. It provides for the payment of annuities to his great grandchildren until the youngest and last one is twenty-two years of age (item 15). This would be impossible if it meant only those living at the death of testator.

6. Because it is a presumption of law that he meant the great-grandchildren living at his death as well as those who subsequently came into existence prior to the period of distribution: Minnig v. Batdorff, 5 Pa. 503.

7. Because he provides for the executors caring for all the children of Sarah Hershey (item 3) and Kate A. Landis (item 4) until they arrive at the age of twenty-two years, which would certainly include those living at the death of testator as well as those born subsequently. This might be impossible if the will meant that final distribution was to be made when the youngest great-grandchild living at death of testator had attained the age of twenty-two years.

The will must be construed so that all of it may stand, if this be possible. As has been shown, many parts of the will would be meaningless if the word "living" is to be construed as meaning "living at death of testator." All parts of the will would have a meaning if the word "living" means "living at the time of distribution." Therefore your auditor finds this is the construction that must be given it. The testator meant that when C. N. Gerber was dead; when all his children, those living at testator's death, as well as those born afterwards, were dead; and when the youngest one of their children living (not making it necessary for a younger one who had died, would have been twenty-two had it lived) was twenty-two years of age, the estate should be distributed.

Can this time for distribution arrive after lives in being and twenty-one years?

In answering this question we will endeavor to see if it is possible that the time for distribution may arrive after lives in being and twenty-one years, and not whether it is likely to occur within that time.

"It is not enough that a contingent event may happen, or even that it will probably happen within the limits of the rule against perpetuities, if it can possibly happen beyond those limits, an interest conditioned on it is too remote:" Gray on Perpetuities, sec. 214; Coggins's Appeal, 124 Pa. 10.

"For the purpose of determining questions of remoteness men and women are deemed capable (Gray on Perpetuities, sec. 215) of having issue so long as they live."

The "lives in being" in the present case are all the children of C. N. Gerber, born prior to testator's death, possibly including C. N. Gerber himself.

Keeping these principles in mind, your auditor finds that the period for distribution in this estate can occur in each of the following ways, at a period beyond that allowed by the rule agains perpetuities.

1. Christian N. Gerber, testator's son, was about fifty-five years of age when testator died. He may have children born after the death of testator. Such children might survive C. N. Gerber, and all of his children who were alive at the death of testator for a period in excess of twenty-one years. There could be no distribution while they lived, for it must be after the death of all testator's grandchildren. The time for distribution would then be postponed until after "lives in being at death of testator" (grandchildren living at death of testator and possibly C. N. Gerber) and the twenty-one years or longer time that these second children might survive these "lives in being at the death of testator."

2. Christian N. Gerber (testator's son) had eight children (testator's great-grandchildren) at the time of testator's death. Christian N. Gerber and his eight children must die before the time for distribution arrives. The seven great-grandchildren of testator may die before their parents. Some of the eight grandchildren may leave a child or children who would not be a year old at the time of the death of C. N. Gerber and the last of C. N. Gerber's eight children. The time for distribution then could not arrive until it or they had attained the age

of twenty-two, which would be more than twenty-one years after lives in being at the death of testator.

3. The eight children of C. N. Gerber might survive him; the seven children of these eight children might survive their parents, who may leave other children besides these seven. Some of or one of these other or later children might not be a year old at the death of the last of C. N. Gerber's eight children. It must attain the age of twenty-two years before there can be a distribution. This would postpone the time for distribution for more than twenty-one years after the expiration of lives in being at the death of testator.

The rule against perpetuities is as follows:

" No interest subject to a condition precedent is good unless the condition must be fulfilled, if at all, within the twenty-one years after some life (lives) in being at the creation of the interest:" Gray on Perpetuities, sec. 201.

The rule, as laid down by our Supreme Court, is:

" 1. Perpetuities are grants of property wherein the vesting of an estate or interest is unlawfully postponed; and they are called perpetuities not because the grant as written would actually make them perpetual but because they transgress the limits which the law has set in restraint of grants that tend to a perpetual suspense of the title or its vesting.

" 2. The law allows the vesting of an estate or interest to be postponed for the period of lives in being and twenty-one years and nine months thereafter, and all restraints upon the vesting that may suspend it beyond that period are treated as perpetual restraints and, therefore, as void, and consequently the estate or interests dependent upon them are void, and nothing is denounced as a perpetuity that does not transgress this rule:" Phila. v. Girard's Heirs, 45 Pa. 26.

The interest given to the heirs of C. N. Gerber is not vested. If it were a vested interest the rule against perpetuities would not affect it. The rule does not deal with vested interests as is stated in the citation above for Phila. v. Girard's Heirs, 45 Pa. 26. Also see Gray on Perpetuities, sec. 205, Coggins's Appeal, 124 Pa. 10, and Johnston's Estate, 185 Pa. 179.

" An estate is said to be vested in interest when there is a present fixed right in some one of future enjoyment of it; it is not vested but contingent, when either the person who is to en-

joy it or the event upon which the estate is to arise is uncertain: " Johnston's Estate, 185 Pa. 179.

" Where real or personal estate is divided or bequeathed to such children . . . . or individuals as shall attain a given age . . . . or be living at a certain time, without any distinct gift to the whole class preceding such restrictive description, so that the uncertain event forms part of the description of the devisee or legatee, the interest so devised is necessarily contingent on account of the person. For until the age is attained, the character sustained or the act performed, the person is unascertained; there is no person answering to the description of the person to take as devisee or legatee: " Smith on Executory Interests, p. 281, cited Johnston's Estate, 185 Pa. 186.

See also Coggins's Appeal, 124 Pa. 10, for an application of the rule very similar to the present case.

Under the will of Andrew Gerber there is no present fixed right in some one of future enjoyment of his estate. The persons who are to enjoy it are uncertain. They must be heirs of C. N. Gerber, and until his death no one answers that description. The time of enjoyment is also uncertain. So that the future interests given under this will are contingent and not vested.

There is but one more observation necessary as to the second estate. Under the ways suggested in which it may not vest until more than twenty-one years after a life or lives in being it might vest in some of the class, viz: those great-grandchildren who were over a year old at the time of the death of the last grandchild of testator. If it, however, is void as to one member of a class it is void as to all: Coggins's Appeal, 124 Pa. 10.

Having shown that this second estate is not a vested interest; that it may possibly not vest in any one until a life or lives in being and twenty-one years thereafter, and that in this it offends the rule against perpetuities, we therefore believe it to be void. A very similar case has been decided in Pennsylvania, in the opinion of which much that applies to this case has been examined, and the auditor rests his opinion as to this second estate or interest, almost entirely on this case. It is Coggins's Appeal, 124 Pa. 10.

2. The auditor will next consider the first estate or interest named above.

The rule against perpetuities is only directed against future estates. There was nothing future about this estate except its continuance. It began within the required limits, viz: lives in being and twenty-one years and it is of no consequence, so far as concerns the rule that it extends beyond it. If the rule admits of no exceptions, but it is to be applied in every case, then this particular estate must stand. But that is a conclusion that it would seem right if possible to be avoided, for this estate or interest left standing alone cannot with any reason be said to express the testator's wishes.

The auditor used the language of Judge STEWART, in Johnston's Estate, 185 Pa. 179, in the above statement, a very similar case. His opinion was commended very highly by the Supreme Court and adopted as their own in that case.

A testator left his estate to trustees for seventy-five years. First, to pay taxes and repairs. Second, pay income to his children and their legal descendants. Third, to sell the real estate and at the end of seventy-five years to pay principal to his children that were living and the legal descendants of those who were dead. The court held that these were two estates, one to the trustees, vested at the death of testator and on that account not offending the rule against perpetuities, and an estate or interest in the children of testator who were living at the expiration of seventy-five years, or the legal descendants of such as were dead.

The latter estate was held void because it violated the rule against perpetuities.

The former estate, the one to trustees, was held void also. It did not violate the rule against perpetuities, but came within two exceptions to the rule, and this case established this as the law in Pennsylvania.

The exceptions, as expressed in the opinion, were as follows (p. 191):

"No cases are to be found in Pennsylvania supporting the view here expressed, but neither can any be found which are in conflict with it. There are cases, Lawrence's Estate, 136 Pa. 354, and others which recognize the general rule as stated by Lewis, viz: 'that a prior estate neither receives enlargement nor suffers diminution when a remainder expectant upon it is declared void for remoteness,' but the question whether this

general rule admits of exceptions is nowhere discussed in any of them. Elsewhere we have seen the rule is not invariably applied, and a recognized exception is where, as in this case (1) the failure of the ulterior estate disturbs, so as to defeat the main and dominant purpose of the testator. (2) Another is where a particular prior estate is adopted as a means for the accomplishment of that which the law forbids. The present case falls within both exceptions."

The reason for these conclusions is most clearly stated in the opinion on bottom of pages 189 to 192.

Prof. Gray, in his work on perpetuities, says that if the question that arose in that estate, came before the courts, it would be decided just as the Supreme Court of Pennsylvania did decide it in Johnston's Estate.

In sec. 418, Gray on Perpetuities, says: "If the main (not only) object of an executory trust were to create too remote limitations so that apart from such object, there remained nothing to carry out, it is probable that the whole trust would fall, although there is no case so holding:" Gray on Perpetuities, sec. 671.

"Thus if there be a direction in a will to accumulate the income for fifty years, and at the end of the time pay the accumulated fund to those who shall then be the heirs of the testator, the gift is void, and those persons will be entitled to the property who would have been entitled to it, had the direction to accumulate and the gift of the accumulated fund both been omitted from the will. The gift of the accumulated fund is void, the direction to accumulate is also to be disregarded and this can be done in either of the two theories. It may be said, that the trust to accumulate exists only for the sake of the gift of the accumulated fund, and as the gift is void, the trust to accumulate fails also."

As has been stated Johnston's Estate and the present one are very similar. In both the wills attempt to create two estates or interests. In both the estates clearly violated the rule against perpetuities. In the estates to trustees in both there was a power of sale which violated the rule against perpetuities. (The power in this estate might not be exercised until time for distribution.) Both required payment of taxes. Both gave of the income to certain people. In Johnston's

Estate all of the income to the heirs of the testator until final distribution; in this estate, a small part of the income which includes taxes on their farms, to the grandchildren of testator during their lives. In this estate there are annuities to charities until final distribution amounting to $435, there being five Sunday schools in Mount Joy. In this estate there are annuities to the great-grandchildren of from $50.00 to $100 which may not vest in lives in being and twenty-one years, under the second plan and which are, therefore, void and will not be considered here.

In Johnston's Estate the particular estate to trustees was held void. Will the two points wherein the particular estate under the Gerber will differs from that under the Johnston will save it? These points of difference are, first, the payment of $550 of the income to or for the grandchildren of testator annually (assuming that the board and washing of testator's grandson, Samuel, will amount annually to $300) and, second, the payment of $435 of the income annually to charities (churches, coal and cemetery).

The balance in the hands of the executors or trustees is over $83,000; the real estate of which they have control will run the amount to over $100,000. With accumulations and real estate that must come into their hands before time for distribution, this sum will certainly exceed $250,000. But it is fair to assume that now the income is more than $5,000 annually. Of this he directs to be given to and for certain grandchildren and to charity, not permanently, but during the lives of the former and to the latter until final distribution, less than one fifth.

Could it be contended that this particular estate in the trustees was created for the purpose of paying this one fifth of the income? Does it not seem that the intention of the testator in creating this particular estate was rather to tie up his estate, increasing it by accumulation, until his youngest living great-grandchild was twenty-two years of age? This particular estate was a hook in which he desired to suspend this tied up estate. "How does it in any way," quoting from the opinion in Johnston's Estate, "enforce testator's wishes to leave the hook in its place, when there is no estate to suspend upon it? . . . . Instead of observing his will, is it not rather enforcing one not his, to keep alive under such circumstances, an estate which he

contemplated only in connection with another and larger one
which the law has annulled?"

The "main and dominant purpose" of the testator, was to
tie up and accumulate his estate until a future time. It was
not the "main and dominant purpose" to tie it up that one fifth
and what will soon be one tenth, more likely one twentieth, of
the income might be paid to charity.

The "main and dominant purpose" being defeated by the
destruction of the ulterior estate, the intention of the testator
would certainly not be carried out by permitting this estate to
stand and to accumulate, for a long, uncertain, illegal period,
probably one hundred years, in order that a small part of the in-
come might be paid to charity. If he wanted, as his main and
dominant purpose, to provide for these objects of his charity,
he would have provided for them permanently and not only
until final distribution.

"It is equally clear that in the present case the only purpose
the testator had in connection with the trust he established was
to make an invalid gift. His aim was to control the disposition
of his property beyond the period that the law allows, and this
devise was the scheme adopted to accomplish it. It was a man-
ifest attempt to accomplish an illegal object, and for this reason,
if for no other, the whole scheme should fail:" Johnston's
Estate, 185 Pa. 191.

If a man desired to tie up his estate for an indefinite and ille-
gal time, before having it divided among his heirs, say possibly
a hundred years, and could accomplish it by giving one fifth,
or what must eventually, be less than one twentieth of the in-
come, to charity, or to individuals, what is to prevent him ty-
ing it up for two hundred years by giving one hundredth of the
income to charity? Or if he can do so by giving annually
$435 to charity, what is to prevent him doing so if he gives
$4.35 to charity? If the rule against perpetuities could thus be
set at naught, what would be the use of having it at all?

It seems to the auditor the differences between this estate
and Johnson's estate are not such as will save the particular
estate to the trustees under the Gerber will. The creation of
the particular estate being the scheme adopted to control the dis-
position of his property beyond the period that the law allows
was a manifest attempt to accomplish an illegal object, and for

this reason the whole scheme must fail, in this estate just as it did in Johnston's Estate. See also Hillyard v. Miller, 10 Pa. 326.

The auditor rests his opinion upon the two following cases: Coggins's Appeal, 124 Pa. 10, for the destruction of the ulterior estate, and Johnston's Estate, 185 Pa. 179, for the destruction of the particular estate in the trustees.

The auditor's conclusion is that the entire amount now in the hands of the executors, less costs of audit, should be paid the Lancaster Trust Company, trustee of Christian N. Gerber, the only son.

*Error assigned* was the decree dismissing exception to auditor's report.

*A. G. Dickson*, with him *W. U. Hensel*, for appellants.— In all cases of doubtful construction the law leans in favor of an absolute rather than a defeasible estate; of a vested rather than a contingent one: Smith's App., 23 Pa. 9; Manderson v. Lukens, 23 Pa. 31; Passmore's App., 23 Pa. 381; Rewalt v. Ulrich, 23 Pa. 388; Womrath v. McCormick, 51 Pa. 504; Chess's App., 87 Pa. 362.

If it be decided that the estate given by this will is a vested interest, then it is not subject to the rule against perpetuities, for ex vi termini it is not subject to a condition precedent: Gray on Perpetuities, sec. 205.

The fact that a provision would be too remote if construed in a certain way is a reason for supposing that it was not intended to be construed in that way, which, although it cannot avail against a clear form of words, may well be held to govern when the expression is ambiguous: Gray on Perpetuities, sec. 633; Wolf's Est., 9 W. N. C. 260; Chess's App., 87 Pa. 362; Ashhurst's Est., 17 W. N. C. 538.

Where the time of a legacy is annexed to the payment it is vested: 1 Roper on Legacies, chap. 10, sec. 2, p. 555; 1 Jarman on Wills, *763; Letchworth's App., 30 Pa. 175; Clark's Est., 14 W. N. C. 94; Coggins's App., 124 Pa. 10.

Even though the vesting of a legacy be postponed, if it must vest within the time permitted by the rule against perpetuities, it is immaterial as to when it is to be paid, even though its taking effect in possession is postponed beyond the boundary of

perpetuities: Lewis on Perpetuities, * 511; 1 Jarman on Wills, * 252; Clark's Est., 14 W. N. C. 94.

A prior estate neither receives enlargement nor suffers diminution when a remainder expectant upon it is declared void for remoteness: Lawrence's Est., 136 Pa. 354; Lewis on Perpetuities, * 657.

*A. B. Hassler*, for appellee.— This is not a vested interest: Philadelphia v. Girard's Heirs, 45 Pa. 26 ; Gray on Perpetuities, sec. 205 ; Coggins's App., 124 Pa. 10 ; Johnston's Est., 185 Pa. 179.

The rule against perpetuities was violated: Davenport v. Harris, 3 Grant, 164; Philadelphia v. Girard's Heirs, 45 Pa. 26 ; Minnig v. Batdorff, 5 Pa. 503; Johnston's Est., 185 Pa. 179; Hillyard v. Miller, 10 Pa. 326; Coggins's App., 124 Pa. 10.

PER CURIAM, May 29, 1900:

The auditor's report in this case contains a very thorough, able and exhaustive review of all the matters of fact and law involved in the present contention. There is no controversy as to the facts, and the question whether the provisions of the will are in conflict with our law against perpetuities is so fully and carefully considered, and the conclusions reached are so entirely in accord with our convictions, that we affirm the decree of the learned court below upon the report of the auditor.

Decree affirmed and appeal dismissed at the cost of the appellants.