Laucks Estate.

Argued January 14, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

370

George Wharton Pepper, with him Richard E. Kohler, William Carson Bodine, Thomas Stokes, Frank S. Sauer and Pepper, Bodine & Stokes, for appellant.

E. Philip Stair and Raymond M. Remick, with them William H. Kurtz, Charles S. Cunningham, Cletus Keating, Ralph F. Fisher, Carl R. May, Fisher, Ports & May and Saul, Ewing, Remick & Saul, for appellees.

William H. Kain, with him Kain, Kain & Kain, guardian and trustee ad litem, in propria persona.

OPINION BY MR. JUSTICE HORACE STERN, March 22, 1948:

S. Forry Laucks, a widower, died in 1942, leaving a son, Elliott Forry Laucks, then 44 years of age, who is the father of two children now aged 17 and 12, respectively. Also surviving him were three sisters, two of whom have since died, twelve nephews and nieces, and a grandnephew and grandniece, the children of a deceased nephew.

The provisions of decedent's will, written in 1934, may be summarized as follows:

1. A devise of the residence 40 North Queen Street in the City of York, together with the household goods and furniture contained therein, to his son Elliott for life.

2. A legacy to a Beneficial Association.

3. A legacy to his chauffeur.

4. The entire residuary estate to the Chase National Bank of the City of New York, in trust for the following purposes:

(a) To pay to Elliott during his life $50 per week.

(b.) To pay to Elliott's wife $5,000 per annum so long as Elliott and she live together.

(c) If Elliott dies leaving a widow, and they are living together at the time of his death, to pay to such widow $5,000 per annum until her death or remarriage.

(d) To appropriate such sums as the trustee may deem advisable for the support, maintenance and education of each of Elliott's children until they shall respectively attain the age of 25 years.

(e) During Elliott's life to pay 10% of the annual net income of the estate not applied as hereinbefore stated, to certain institutions as follows:—

4% to the Children's Home of York;

2% to Trinity First Reform Church of York;

2% to Franklin and Marshall College;

2% to York Collegiate Institution and York County Academy.

(f) During Elliott's life to distribute semi-annually the remaining 90% of such net annual income in such amounts and in such proportions as the trustee in its discretion may deem proper and advisable to and among Elliott, his wife and family, decedent's brothers[1] and sisters and the descendants of any deceased brothers and sisters who may be living at the time of such distribution.

(g) Upon Elliott's death the residue of the estate then remaining "shall be considered as divided into as many parts as my son has children or issue of deceased children, per stirpes, then surviving and my Trustee shall use and apply each share to the support, maintenance and education of such child or issue of deceased child until they shall respectively attain the age of twenty-five (25) years. Upon their respectively attaining that age, one-half (½) of each such share shall be paid to such child and the other half shall be equally divided, per capita, among the children of my brothers and sisters then surviving."

---

[1] Decedent's only brother predeceased him.

372

5. A grant of power to the executor and trustee to invest the securities of the estate and to sell any or all of the investments and real estate, including the Queen Street residence.

6. Appointment of the Chase National Bank as executor.

The Bank has been carrying out the provisions of the will in regard to the distribution of the income. In accordance with paragraph 4(f) it has made distributions among Elliott, his wife and children, amounting to approximately 40% of the 90% of the net annual income, and distributions of the remaining 60% thereof among decedent's surviving sisters, the children of deceased sisters and the child of a deceased brother.

By agreement between Elliott and the Bank as executor and trustee the Queen Street property was sold and the proceeds turned over to the Bank in trust to pay the income therefrom to Elliott during the term of his life and to invest and reinvest the corpus.

From each of three adjudications by the Orphans' Court of York County an appeal has now been taken by Elliott Laucks. One of these adjudications was in connection with the second and partial account of the Bank as executor, another with the first and partial account of the Bank as trustee, and the third with the first and partial account of the Bank as trustee of the proceeds of the sale of the Queen Street property. In the course of these adjudications there were presented to the Court for consideration the following questions:

1. Is the provision of paragraph 4(g) of decedent's will, that the residue of the estate should be considered as divided into as many parts as Elliott has children or issue of deceased children, per stirpes, surviving at the time of his death, and upon their respectively attaining the age of 25 years one half of each such share should be paid to such child, void because in violation of the rule against perpetuities, or is it valid on the theory that the interest thus given is vested and not contingent

because the children are meanwhile to enjoy the income therefrom for their support, maintenance and education?

2. Is the provision that the other half of each such share should at that time be equally divided, per capita, among the surviving children of decedent's brothers and sisters, void on the theory that the interest thus given to the nephews and nieces is contingent and in violation of the rule against perpetuities?

3. If the limitation to the children be valid but the limitation to the nephews and nieces invalid, does the invalid bequest pass to the children in accordance with the provisions of section 15(c) of the Wills Act of 1917, P. L. 403?

It was the contention of Elliott that the entire disposition of the corpus under paragraph 4(g) of the will violates the rule against perpetuities and is void, that it therefore accrues to him under the intestate law, he being decedent's sole heir, and that he is entitled to its immediate possession because the prior limitation of paragraph 4(f) is so bound up with the dispositive scheme as a whole that it also becomes invalidated.

The collateral relatives entitled under the will to share in the 90% of the net income from the residuary estate contended that the prior limitations are valid and that the disposition of the corpus is also valid although it is not necessary at this time to decide the latter question.

The guardian ad litem of Elliott's children and of possible unborn issue contended that the grant of the half-shares to the children is valid, that the grant of the half-shares to the collateral relatives is void, that the latter half-shares therefore pass under the Wills Act to Elliott's children and should be awarded to them upon their respectively attaining majority, and that meanwhile the prior limitations should remain undisturbed.

The Chase National Bank, as executor and trustee, contended that all the dispositions of income prescribed

by paragraph 4. (a, b, c, d, e and f) of the will are vested active trusts which must be sustained, that it is premature to consider whether the disposition of the corpus violates the rule against perpetuities, but that, in any event, such disposition is valid.

The court below held that the bequests to take effect during Elliott's life are valid whether or not the disposition of the principal of the residuary estate violates the rule against perpetuities and therefore that a present discussion of the latter question is untimely. It confirmed the accounts presented to it and left the corpus in the hands of the trustee to be administered during the lifetime of Elliott in accordance with the provisions of the will.

In an extremely long line of cases this court has consistently adopted the practice of refraining from a determination of the legality of ultimate limitations in a will if there are precedent estates which would not be affected even though the subsequent ones were to be declared invalid: *Goddard's Estate,* 198 Pa. 454, 457, 48 A. 404, 407; *Whitman's Estate,* 248 Pa. 285, 292, 93 A. 1062, 1064; *Strickler's Estate,* 250 Pa. 105, 95 A. 393; *Lockhart's Estate,* 267 Pa. 390, 111 A. 254; 306 Pa. 394, 406, 159 A. 874, 878; *Jones's Trust Estate,* 284 Pa. 90, 94, 130 A. 314, 315; *McCaskey's Estate,* 293 Pa. 497, 507, 508, 509, 143 A. 209, 213; *Hecht's Estate,* 316 Pa. 12, 14, 173 A. 324, 325; *Warren's Estate,* 320 Pa. 112, 120, 121, 182 A. 396, 399, 400; *McCreary's Trust Estate,* 328 Pa. 513, 518, 196 A. 25, 27; *Quigley's Estate,* 329 Pa. 281, 294, 198 A. 85, 90; *Wanamaker's Estate,* 335 Pa. 241, 253, 6 A. 2d 852, 857; *Uch's Estate,* 338 Pa. 396, 12 A. 2d 905; *Reed's Estate,* 342 Pa. 54, 59, 19 A. 2d 365, 367; *Bilyeu's Estate,* 346 Pa. 134, 137, 29 A. 2d 516, 518. Therefore the first question in this litigation, and, if answered in the affirmative, the presently controlling one, is whether the clauses of decedent's will which provide for the disposition of the income from his estate during the lifetime of Elliott are valid and sustainable whether or not

the disposition of the corpus or any part of it is void because in violation of the rule against perpetuities.

It is undoubtedly the *general* doctrine that the validity of prior limitations is not affected by reason of ultimate ones which transgress the rule, the truth of this statement being strikingly demonstrated by the fact that in all the cases above cited it was held that the life estates there involved were valid irrespective of the validity or invalidity of the subsequent limitations, while the same conclusion has been reached in other cases in which the problem has been presented to this court; for example: *Lawrence's Estate,* 136 Pa. 354, 20 A. 521; *Ewalt v. Davenhill,* 257 Pa. 385, 101 A. 756; *Hays's Estate,* 288 Pa. 348, 135 A. 626; *Kern's Estate,* 296 Pa. 348, 145 A. 824; *Betts v. Snyder,* 341 Pa. 465, 19 A. 2d 82; *Yewdall's Estate,* 343 Pa. 478, 23 A. 2d 460; *Yeager Estate,* 354 Pa. 463, 47 A. 2d 813. Prior bequests, if entirely valid in themselves, fall only where they are such closely integrated factors in a general scheme of distribution, the vital portion of which is invalidated because of remoteness, that they cannot be detached without defeating the organic plan of the testator: *Feeney's Estate,* 293 Pa. 273, 286-289, 142 A. 284, 289, 290; *Quigley's Estate,* 329 Pa. 281, 289, 198 A. 85, 88. The test to apply in order to determine whether such inseparability exists has been variously stated,—sometimes that the criterion is the "main and dominant purpose of the testator" (*Johnston's Estate,* 185 Pa. 179, 192, 39 A. 879, 883), other times that the inquiry should be directed to ascertaining whether "the striking down of the void gifts would, in vital matters, so emasculate his [the testator's] plan of distribution, as to render it reasonably certain he would not have made the will in the way he did had he known it could not be sustained in the respects in which it must be set aside." (*McCaskey's Estate,* 293 Pa. 497, 508, 143 A. 209, 213.) In other words, would the testator probably have desired that all the limitations of the trust should stand or fall together?

Is the ultimate limitation apparently so essential to his dispositive scheme that it can be inferred that, if it were to be declared invalid, he would not have wanted the prior limitations to continue in existence?

It is obvious that to answer such questions satisfactorily must sometimes be a task of great difficulty since it involves the necessity not only of drawing inferences from the provisions of the will but of indulging in a certain measure of sheer speculation as to whether, and to what extent, the testator would have modified his will in respect to prior limitations had he foreseen the impossibility of the rest of his testamentary intentions being carried into effect. But just as in a curative operation a surgeon naturally avoids cutting away more tissue than what is absolutely necessary, so, ordinarily, there should be grave hesitation on the part of a court in nullifying any part or parts of a will other than those which are definitely contrary to law. The comparatively few instances in which this Court has undertaken to strike down an entire testamentary scheme because of the invalidity of some of its provisions are discussed in *Quigley's Estate,* 329 Pa. 281, 291-294, 198 A. 85, 89, 90. It was there pointed out that they were cases where, as in *Johnston's Estate,* 185 Pa. 179, 39 A. 879, the testator wished to prevent the alienation of his farm properties for a fixed period of 75 years, at the expiration of which time the proceeds of a then permissible sale were to be distributed among his lineal descendants then living; or, as in *Gerber's Estate,* 196 Pa. 366, 46 A. 497, where the testator's farms were not to be disposed of until his grandchildren had all died and his youngest great-grandchild had become twenty-two years of age, the proceeds of a sale then to be had to be divided among the heirs of his son, or, as in *Kountz's Estate (No. 1),* 213 Pa. 390, 62 A. 1103, where the testatrix tied up her estate and placed it beyond the power of either her children or grandchildren to interfere with its distribution which, she provided, should not be effected until ten years after

the date when her youngest grandchild should come of age; or, as in *Geissler v. The Reading Trust Co., Trustee,* 257 Pa. 329, 101 A. 797, where the estate was to be distributed to the testator's great-grandchildren after the death of all his grandchildren, which, in the natural course of events, would not have been for a period of from fifty to eighty years or more after the termination of the lives in being at the time of his death; or, as in *Lilley's Estate,* 272 Pa. 143, 116 A. 392, where all of the testator's property was to be held intact for 99 years, at the expiration of which time his estate was to be divided among the heirs of two of his nephews; or, as in *Ledwith v. Hurst,* 284 Pa. 94, 130 A. 315, where the testator's real estate was not to be sold, if his daughter left issue, until the death of the last of her descendants; or, as in *Feeney's Estate,* 293 Pa. 273, 142 A. 284, where, in order to prevent his son and his son's children from having a beneficial interest in his estate and so that they should never be able to use or transmit any of the principal, the testator provided that the corpus was to be carried over if necessary to the heirs of his residuary legatees however remote; or, as in *Scott's Estate,* 301 Pa. 509, 152 A. 560, where the trust created by the testator was not to be terminated and his estate distributed until the death of all his grandchildren.[2]

Entirely different from all these cases is the present situation. Here the testator did not prescribe a remote time until the arrival of which his property was to remain unsold; on the contrary, the executor and trustee is given full power to sell, invest and reinvest the assets.

---

[2] After the first three of these cases—*Johnston's Estate, Gerber's Estate* and *Kountz's Estate*—had been decided, they were critically reviewed and disapproved by academic authorities: Gray, Rule against Perpetuities, 4th ed. pp. 265, 266, §249.2; Foulke, Rules against Perpetuities, Restraints on Alienation and Restraints on Enjoyment as Applicable to Gifts of Property in Pennsylvania, §§472-476; see also 77 U. of P. Law Review p. 523, where the decisions in *Geissler v. The Reading Trust Co., Trustee,* and *Feeney's Estate* were also subjected to adverse comment.

Here there was no provision for the accumulation of income; on the contrary, it is all to be distributed periodically during the lifetime of the testator's son. Here there was no attempt to keep the testator's estate intact for the benefit of remote lineal descendants; on the contrary, the time for distribution (the attainment by each of his son's children and surviving issue of deceased children of the age of 25 years) cannot be long delayed, if at all, after his son's death. From a reading of his will it is reasonably clear that the period with which decedent was most concerned was that of Elliott's lifetime. He was leaving a very large estate and, for reasons best known to himself, he did not care to turn it over to his son or even to give him the entire income therefrom; instead he limited him to a stipulated allowance; he provided an annuity for Elliott's wife, made a bequest of so much of the income for the maintenance and education of Elliott's children during their minority as the trustee might deem advisable, and directed that certain annual payments be made to charitable and educational institutions to which he himself had possibly been making periodical contributions. These arrangements all seem like the normal, almost conventional, testamentary dispositions of any broadminded person of large means, and indeed appellant concedes that they are valid bequests and must in any event be sustained. The question then remained with the testator as to the disposition of the balance of the income. Was it not natural and eminently proper that he should want it devoted during his son's lifetime (which he might fairly envisage as a period of thirty or forty years) to the benefit of his nearest lineal and collateral relatives,—his son, his son's family, his aged sisters, and his nephews and nieces? But in what proportions should it be allotted to them? Was it strange or unwise on his part to believe that this could be determined by others, in the light of future events that might develop after his death, better than by himself in a will being written at a time when his son

was still comparatively young—36 years of age—and his son's then only child was but 4 years old? His sisters would die, his nephews and nieces might from time to time have varying needs for financial support, his son and son's family might, if emergencies occurred, require more income than the allotments he had made to them,— all of these circumstances and contingencies could best be met by a trustee who would be able to deal with them as they might arise, whereas he himself could not foresee the uncertainties of the future. There is nothing unusual in such testamentary provisions unless it be that he vested the necessary discretionary power in a corporate institution rather than an individual; but that choice is explained by the confidence he presumably had in the good judgment and ability of its officials. Certainly in all this planning there does not appear any dominant intention to tie up the corpus of his estate for any fixed, remote period, nor any manifestation of either a careless or a studied indifference as to the interim disposition of the income. The main purpose which is indicated is that his son should not obtain control of either the principal or the income beyond the provision actually made for him, and surely nothing could be conceived as being more fatal to the implementation of that purpose than that, if the disposition of his residuary estate should be nullified, his plan for the distribution of the income during his son's life should also be invalidated and the entire corpus fall immediately and unreservedly into Elliott's ownership. It cannot be said, therefore, in this case, that the precedent limitations established by the testator's will were intended merely as "legalistic props" to support the continuance of his estate until its final liquidation; on the contrary, it is clear that they constituted the most important part of his testamentary scheme and expressed his most imperative desires.

In view of what has been said, it is superfluous, perhaps, to add that because of the provision in paragraph

4(e) that the charities and educational institutions were to receive 10% of the annual net income of the estate not otherwise applied under the terms of the will, it would be necessary in any event to keep the estate open until final distribution of the corpus because of the rule that, where there is a gift of a fractional share of income from an entire estate for a prescribed period of time, the whole principal must be preserved intact for the payment of that share so long as the limitation is to last, since it cannot be said that a share of income from the entire estate is not more valuable than the income from a proportional share of the principal: *Lockhart's Estate,* 306 Pa. 394, 405, 159 A. 874, 877. As to appellant's argument that he is entitled to an immediate determination in regard to the validity of the disposition of the corpus of the residuary estate because a favorable decision might result in his being invested with a fee simple title instead of merely a life interest in the Queen Street residence, it is sufficient to say that not only has that property been converted into personalty but, by the agreement which he entered into with the Bank, he voluntarily established a trust under which only the income from the proceeds was to be paid to him during his lifetime.

Decrees affirmed; costs to be paid by appellant.